Okay, the next argued case is number 181450, Comcast Corporation against the International Trade Commission, Mr. Verrilli. Good morning, and may it please the Court, I'm Don Verrilli for Appellants. The Commission's order against Comcast exceeded its jurisdiction for two reasons. First, importing set-top boxes cannot violate Section 337 because they are not articles that infringe. Section 337 is an in-rem statute, so the focus has to be on the status of the articles as they cross the border. These boxes do not satisfy all limitations of any Roe v. Claim, so they don't violate Section 271A. They're staple articles, so their importation cannot be contributory infringement, and Suprema does not... Mr. Verrilli, how does your case differ from the facts in the law of Suprema? That's a key question, Your Honor, and I think it does differ factually and legally in a little here, and even that Suprema doesn't justify the exertion of jurisdiction. And if I might just walk through a little bit, and again, I don't mean to be presumptuous, especially with Your Honor in suggesting that I can tell you what Suprema means, but I can tell you how I read it. And I would start with the holding, the conclusion, where the Court holds that the Commission's interpretation that the phrase, articles that infringe, covers goods that were used by an infringement is reasonable. I think the differences are many here. First, the importer here, Comcast, did not directly infringe. Second, there was no inducement... Just to get this out of the way, so Comcast is the importer in this case? No, no, forgive me, that's our second argument, that Comcast is not the importer, but even if, you're going to grant it for the purposes of analyzing this here, that Comcast did not directly infringe. And the other key point, I think, is that in Suprema, Suprema, the foreign company, did the inducing pre-importation, and I do think that that's the key difference. And that, as I understand the Court's opinion, created the connection to the statutory language and its in-REM focus, and that there was pre-importation inducement, and that Suprema convinced Mentalics to import these scanners... Is there not pre-importation inducement in this case? No, Your Honor, there is no pre-importation inducement in this case, and I think that's quite clear. All of the inducement occurs in the United States after importation. All of the inducement is Comcast convincing its customers to use the mobile app, which allegedly infringes the Roe v. Patent, so there is no inducement pre-importation. To keep it simple, I thought you weren't contesting inducement. We're not contesting inducement, Your Honor, but what we are contesting is that there was any pre-importation inducement, which I respectfully suggest is what you need to create the connection to the in-REM focus of the statute, that the articles have to infringe when they cross the border. And as we read Suprema, what it says is that you could find that the articles infringed when they crossed the border because there was pre-importation inducement involving the articles. In fact, Suprema convincing Mentalics to import the articles and to use them in the way that Mentalics did in combination with the software that resulted in direct infringement was the inducement. It was the persuasion... Doesn't Comcast, in this case, send the programming specifications to Aris and Technicolor? I mean, tell them how to produce the boxes and send them the specifications to do that. So yes, Your Honor. I'd like to make a specific point and then a broader point about that, if I could. With respect to the specific point, we do give them specifications so that the boxes that Aris and Technicolor manufacture will work in our system. And it is true that in footnote 13 of the Commission's decision, which is at page 85 of the appendix, in their alternative backup holding, they say that that amounts to inducement. But I think that there's a fatal legal flaw with that argument because if one looks at the record pages that the footnote cites, what those record pages say are just what Your Honor said, that we provide the specs that Aris and Technicolor then use to manufacture the devices. But that's not inducement. In fact, the ALJ found that it's not inducement. That's at page 373 of the appendix. Because Aris and Technicolor engaged in no direct infringement, and so any directives that we made to Aris and Technicolor can't be inducing infringement because, of course, under Global Tech, inducement infringement has to be aimed at the direct infringer. So just as a matter of law, it's wrong to say that that was pre-importation inducement. And if one looks at the citations, that is the only pre-importation inducement that those citations could even arguably refer to. The other parts of the citations all refer to Comcast's domestic activity, trying to convince its subscribers to use the mobile app. So respectfully, there is zero evidence of pre-importation inducement here, and that's the critical distinction from Suprema. And I do think, but I do think if I could make a more general point here and just take a step back, it may help the court understand why this case really is the polar opposite of Suprema. These set-top boxes, as was found in this proceeding, are staple articles. They perform generic functions when they are combined with Comcast's system. A Comcast system is a cloud-based system. All the intelligence in the system resides on the servers, not on the box. And the boxes only work with a Comcast system, correct? Yes, that's true, Your Honor, but that's sort of normal in this industry, and that's true. But the boxes have no other use other than with the Comcast system. That's true, but they are still staple articles of commerce, as the ALJ found, and the Commission did not disturb. And that's because the overwhelming majority of... If that's the case, then why weren't the scanners in Suprema also staple articles of commerce? Well, I think the difference, Your Honor, is that the scanners, the difference is that and persuaded them to use the software development kit to create software that... That doesn't seem to be answering the same question. That's answering the question of inducement and the like. But you're arguing that even though the Comcast boxes are especially built for Comcast, are designed to work with Comcast's system, they're still staple articles of commerce, but it seems to me that the very same thing could have been said of the scanners in Suprema. I understand that, but I think there's a vital difference, and it's this. Once the software was loaded on, which was what Suprema was trying to persuade Mentalics to do, then those scanners at that point infringed 100% of the time. 100% of the scanners infringed 100% of the time. Here, what you have is a situation in which when these boxes come in, and this was the finding by the ALJ, undisturbed, 99% of the boxes are never involved in any infringing activity. 1% of the boxes are involved in the infringing activity alleged here. But even those 1% are predominantly used for non-infringing uses. And so you have a situation in which you've got an exclusion order that bans 100% of the importation of these boxes in a situation where 99% of the time, there's nothing infringing or not. Would that situation be remedied by the exclusion order itself, by how it's drafted and its scope? Well, the problem here, Your Honor, is I think the way the exclusion order was drafted was to exclude all of the boxes. Now, we were able to come up with a workaround, but I think the workaround... So at this point, are the boxes, they're not coming into the U.S. Customs? No, they are coming in, Your Honor, but if I could just explain why. They're coming in because we made a change, but we didn't make a change to the box. We made a change to the domestic software on the domestic servers so that the app function wouldn't work anymore. The boxes are... and now the boxes are being allowed in, but the boxes are 100% identical to the way they were before the exclusion order, which I think tells you that these are not... Except that you designed around it. You eliminated the feature that was deemed to be infringing, correct? But not in the box, Your Honor, because the... And remember... In the system. In the system, but not in the box. Because this is a system we're looking at. Well, respectfully, Your Honor, I think under the statute, what the court needs to look at is whether these are articles that infringe. I think that's the problem is, and I hate to keep coming back to it, but it seems like you could have made the same argument could have been made in Suprema, that the users of the scanners could have decided to put on different software for those scanners, and then it would have been non-infringing. And so there was a design around there, too. Yes, Your Honor, but the key difference, I think... I'm sorry, I didn't mean to... The key difference, I think, is that... and it was repeated, I respectfully, many times in the Suprema decision is that there was pre-importation inducement by Suprema. Suprema persuaded Mentalex to use the scanners in this way, and then took an affirmative act to promote the inducement by selling the scanners across the border. And that gave the... I understand that position, but it seems to me, even if it's slightly factually different, I mean, that it's still fairly much the same, that Comcast is directing these manufacturers to make these certain specifications so that they'll be imported and that the customers can use the mobile apps in a way that will infringe. So it may not be the same exact chain of pre-importation inducement, but it seems like a possibly different chain that still suffices. If I could just make two points, and then I'd like to make some points about the importer issue if I could. I think that the differences are vital, given that the statute focuses on whether these are articles that infringe when they cross the border. And so the pre-importation inducement is vital. And although there was pre-importation communication with Aris and Technicolor, there was no pre-importation inducement. The ALAJ specifically found that at page 363. So the fact that all the inducement occurs post-importation in the United States, I think, is a critical difference. And that's why you end up in this situation with a wildly disproportionate exclusion order, whereas in Suprema, the exclusion order was perfectly tailored because every one of those scanners that went to Mentholics was going to be used for infringement. So if I could now talk about the importer issue, where we think it's quite clear that we are not the importer. Aris and Technicolor is the importer. Importer is not defined in the statute. Importation is not defined in the statute. So you give it its ordinary meaning, and its ordinary meaning is bringing goods across the border under customs control. Comcast did not do that in this case. Aris and Technicolor did it. And Comcast just entered into a contract to purchase, to take acquisition of the goods once they came across the border. Doesn't our customs law make way for there to be more than one importer? Given a single importation, you can have more than one importer. You can have different characters or actors that are all importers. Yes, that's certainly true, Your Honor. But that doesn't, but I think that doesn't allow one to stretch the meaning of importation and importer so far as to cover us in this case, because what we have here, and what the Commission said in this case is not... Well, why not? You're manufacturing the goods abroad according to particular specifications for use in your system. You're having them, you're requiring the quantity, how much production is to be had. You direct where the boxes are to be sent once they come into the U.S. So if I could make a factual point and a legal point, and then if I could, I'd like to reserve the balance of my time. No, please proceed. As a factual matter, Your Honor, we provide them with specifications. The contract doesn't require that these articles be built abroad or domestically or anywhere else. The record shows that we're agnostic as to where they're built, and I think one way to understand why we're not an importer here is because if Aris and Technicolor tomorrow decided to change their mind and manufacture these products in the United States, the contract would not change one iota, the relationship would not change one iota, the information we provide to them would not change one iota. So what we are sufficiently involved in, to use the Commission's language, at most is the manufacture, not the importation. Now the legal point, if I could, that I think it's... You did pay the importer duties. Let's say you were not the term of our importer record. That still makes you the importer for other purposes of customs law. Well, the Commission didn't find us to be the importer on that basis, Your Honor. They found us to be the importer because we were sufficiently involved because we provided the specs. But as I said, that's just involvement in manufacture, and I think you can't stretch the statutory language as far as they want to, and there are strong textual indicators that you can't. One of them is Section 1508, which is a record-keeping statute and specifically provides for record-keeping requirements for importers and for those who cause importation. So Congress thought of those as two different categories there. If you look at 1528, the same thing is true there, and if you look at 1595, the same thing is true there. And then, respectfully, I think 337 itself shows that Congress made a considerate judgment. It's an importation, sale for importation, sale after importation, and that's it. So I just think you can't stretch the language there. And if I could, I'm sorry to pass my time. Okay. That's fine. Thank you. Thank you, Mr. Root. We'll save you rebuttal time. Thank you. Mr. Rosen, sorry. Good morning, and may it please the Court. Roe v. Units brief contended that the decision in this case on the Suprema issue follows a fortiori from Suprema, and that's definitely true. Counsel for the appellants is relying on a theory that Suprema was decided because Suprema persuaded Mentalics to import Suprema's boxes. That's not true in the public record. I have to be careful because I wouldn't want to impugn opposing counsel. I went back through the confidential record just to make sure that that's not true. You all were on Suprema. You have the briefs, your bench memos, and so forth. There is a factual difference here, though. I'm not sure it makes any legal difference, but all of the boxes, all the scanners in Suprema were loaded with the infringing software, and they operated in an infringing manner. Here, even though they're loaded with it, I think it's undisputed that a very small percentage of the boxes and the end users actually use the infringing functions. Well, I have two responses to that. The first is that one of the principal points of friction in Suprema between the majority and the members of the Court who ultimately dissented was the fact that the exclusion would have to demonstrate that those boxes didn't fall within the scope of the exclusion order and future proceedings, and that chafed some members of the Court quite a lot. Second of all, this issue about 1% of boxes or not, that also came up. Sure, but that's an easier determination to make because it's basically, is this software going to be loaded or is this being sold to a customer that's going to be using a different software? These boxes are all sold to Comcast. They're all loaded with the software, and whether they infringe or not depends on a very downstage use decision by the end user. I assume you agree that it would be impossible to fashion an exclusion order that only targeted the end users that use this device. I disagree with that. I mean, this is a situation in which the boxes not only worked on Comcast Network, they're not allowed to be sold to people other than Comcast. Comcast controls the entire system, end to end. The reason why we have this importation question in this case is because Comcast doesn't even sell its boxes to its users. If it did, this would be a simple sale for importation, but Comcast itself maintains control over the boxes, so we have that importation issue. Is Comcast viewed as a first purchaser after importation? You know, because in this case Aris and Technicolor stipulated to importation, despite the fact that... Are they the consignee? We don't have any of the actual customs paperwork. I mean, as a pragmatic matter, you would think that Comcast would be the consignee insofar as these boxes aren't allowed to be sold to anybody else. Which of the various Comcast corporate entities that might be, I don't know from the record here. In Suprema and in here, the direct infringement occurred before the investigation began. The direct infringement here began when Comcast's license with Rovi expired and Comcast chose not to change its system in any way. The boxes in Suprema, this court might remember, those were method claims for processing, data processing. And one of the arguments that counsel in Suprema made, to your honors, is that none of the reports of those patents were actually performed on the scanners. In this case, the ALJ here found that the X1 table boxes at issue form a necessary part of the claimed local interactive program guide equipment at Joint Appendix page 305. Comcast expert at 1791-92 didn't disagree with that. And that's all waived on appeal. They don't dispute any of the patent findings. So this also makes Comcast more culpable than in Suprema. As I said before, Comcast controls the entire system end-to-end. Unlike Suprema, where Suprema's collaboration with Mentalix occurred and then kind of stopped in the sense that Mentalix developed its FedSubmit software and worked with Suprema scanners, here Comcast's inducement just kept going. Comcast was encouraging its users all along to engage in this remote recording functionality. And Comcast never stopped. Also, unlike Suprema, and your honors may remember also that members of this court had concerns about Suprema's willful blindness, how Suprema could possibly certify as to non-infringement, in this case Comcast admits its own culpable intent to induce. So it admits its own culpable intent to induce. It does so in connection with its complete end-to-end system. If that's true, it admits it only insofar as it induces within the United States only, not pre-importation. It admits the acts of direct infringement in the United States, and it admits that it actively encourages that. I mean, the first case that this court had after Grokster to decide what inducement was going to be in the wake of Grokster was DSU, where this case went in bank, I think, sua court said, if an entity offers a product with the object of promoting its use to infringe, as shown by clear expression or other affirmative steps taken to foster infringement, then it is liable for the resulting acts of infringement by third parties. I mean, that's exactly what happened here, and this, frankly, is a clearer case than Suprema. If I could spend just a couple of minutes on importation, unless the panel has further questions about Suprema. Thank you. Thank you. For decades, the Commission has interpreted its language pragmatically for purposes of importation. The purpose of Commission proceedings is to stop unfair acts, and that's been the case for the better part of a century now. It's not to deal with customs duties. Opposing counsel repeatedly cites other statutes in a part of Title 19 called ascertainment collection and recovery of duties. That's not material here. The Commission isn't concerned with collection of duties, and the Commission isn't concerned with malevolent acts by bad freight forwarders. The goal is to stop the unfair acts. Here, Comcast Control is not just providing the specs to ARIS and Technicolor. I mean, the Commission has three pages of findings as to Comcast Control on pages 135 to 137 of the appendix, and Comcast is not merely contracting for manufacturing and delivery of products. All the boxes are custom-made for Comcast. They work only on Comcast Network. They can't be sold to anybody else. Comcast requires the boxes to be preloaded with what amounts to Comcast operating system, and the argument that it's sitting there in the same way that I might order a box of cornflakes from someone is kind of fanciful. As we've pointed out in our brief, the Commission's test for importation is consonant with case law demonstrating that a person like Comcast is a person who brings articles into the United States. You know, in response to those cases, like this court's decision to put Terry Haggerty, Comcast says, well, the purpose of those other cases was different. But then that proves the Commission's point. If we're going to look at the purpose of those other cases, Terry Haggerty, Hoeven, and Allison, then you look to the purpose of Section 337, which this court has discussed in Suprema and Tianri and Orion and von Klemm and Bakelite for the better part of a century. Comcast simply can't hide in a complicated global supply chain behind its suppliers. With respect to Aris and Technicolor's appeal, it kind of dovetails with this importation argument that Comcast makes. They say that a limited exclusion order extends only to named parties and not to anyone else acting on those parties' behalf. And that's simply inconsistent with global trade. It's inconsistent with- What makes the difference? I mean, they can only sell these to Comcast. So if Comcast, if all the articles imported for Comcast benefit are excluded, it's all the articles for them too. Well, for present purposes, that's true. And I would agree with that. But there's some ambiguity in the record about whether certain software gets shared with other parties at other cable companies as part of some consortium at page 1736. I can't get into the details of that. Comcast could also license its boxes to other cable operators. I don't know that it does so in the United States. So there's a possibility there. But you're right that in this case, these are Comcast boxes. They're coming through Aris and Technicolor as part of multiple steps, sometimes passing to Aris and Technicolor taking title in the United States, other times not in the United States with other actors manufacturing the boxes. As discussed, for example, on page 31637 to 31638, which is Technicolor's, you know, how Technicolor takes title. So the commission has always interpreted the on behalf of language pragmatically. It's consistent with injunctive relief in the district courts under Rule 65 D2C, which notes that injunctions always apply to other persons who are in active concert or participation with anyone described. Many of our 337 cases involve the issue as to the scope of the exclusion order. Here, because Comcast never does sell the boxes, it remains the owner of the boxes, I guess, until they're thrown away or something. That has an effect on the feasibility, on the practicability of making an exclusion order, doesn't it? I don't think it does. I've had discussions with Customs about this. If you ask Customs, how often are you having to rely on on behalf of language, what they'll tell you is almost every case, that the supply chains are so complicated, that things are moving around manufacturing, that companies' transactions are changing because of taxes and other business reasons, that they're always having to look at the articles. They're always having to look at the invoices. They're always having to figure out who the consignee is. In these cases, it's pretty easy, because Comcast articles all say Comcast. They're the sole importer, or they're the only entity that's bringing in the boxes. Wouldn't it be rather simple for them to certify that they're not going to use them in an infringing manner? Well, in this case, they went to Customs. They went to Customs for a Part 177 inter-party ruling. It wasn't part of the Commission record, but it is included toward the end of the appendix. And they got relief, and their boxes were allowed back in. There's a 60-day period of presidential review here, where the boxes were allowed in without bonding. And some two weeks after that, Customs allowed them in. So they really haven't suffered here. One last thing I'll say, because I think it'll benefit the Court. Because Comcast didn't dispute the patents here, both of these patents expire in September. It's not clear from the face of the patents, because one of them has a terminal disclaimer, but I just thought the Court should know that. Thank you. Thank you. We'll hear from Mr. Lampkin. Good morning. Thank you, and may it please the Court. Comcast does not dispute infringement, and it doesn't dispute that it induced that infringement, that it brought its boxes in the country, and intended its customers to complete and use an infringing system. The Commission found that Comcast's infringement-inducing conduct began before importation, the importation itself was inducing conduct, and that it continued after importation. It occurred before importation, when Comcast designed the X1 STBs to be used in an infringing manner, a sort of direct quote out of the Commission's opinion. And it did that in two ways. First, the patents require there to be an internet communication path for the commands, and these boxes are designed to plug into the system and be able to receive that communication over the internet from the remote in order to do the recording function. And they were specifically designed to fit into the system and perform that function. And second, one of the limitations is to have a local interactive television program guide. And the specification explains that that guide can consist of a server and client setup, the set-top box and Comcast servers. And these set-top boxes perform critical functions in that local interactive program guide. They're designed specifically to function it. So the design itself of these boxes to infringe itself is an event that occurred before importation. Importation itself, under Suprema, can be inducement and part of the inducement. And the boxes were brought into the United States, each one of them, as part of a scheme to induce infringement. Comcast has not disputed controls how many come in, when they come in, what the boxes look like, and which of Comcast's facilities they're delivered to. It exercises control of the fact that these are being brought over to the United States. And finally, throughout, Comcast has been inducing infringement. While the boxes are being made, it is promoting, telling, and describing to its users how to use the remote porting functionality. It's promoting the use of the X1 system, including Xfinity apps, and its online and promotional materials. That is all going on as boxes are being made, boxes are being brought across the border, and boxes are being distributed in the United States. Whatever temporal limitations Suprema might impose, under the Commission's findings, it's met here. It really isn't a case that asks the court to test the outer limits of Suprema. In fact, this case is actually much more aggravating than Suprema. At least in Suprema, to practice that method claim, you needed Suprema scanners, you needed a separate computer, and you needed Mentalix's software. Here, Comcast pretty much provides everything. It provides the set-top boxes, it operates the cable system they plug into, it instructs its consumers how to use the infringing system, and it provides the apps and the software needed to complete the infringing system and use it. I wanted to turn briefly, however, to one question, Judge Hughes, and that was your question about 1%. Because I think that, in some sense, is a concern about Suprema, not a concern about its application. But I don't think it's one that should matter. Because under Suprema, the Commission just doesn't have to wait until the inducement hits 30%, or 50%, or 70% of Comcast customers. It's allowed to intervene at the border in order to prevent that inducement from having greater effect. And it makes perfect sense in contexts like this. Because every set-top box that comes across is part of Comcast's scheme of inducing infringement. Everyone is designed to be capable of infringing. For every one of them, Comcast is advertising, you may use these boxes, you may use our system, you may use your remote, in order to do the functionalities that are covered by Rody's claims. And remember, that 1%, Judge Hughes, that's millions and millions of infringing uses, because the Comcast system is so vast. 200,000 to 300,000 per month is what the record says. And the second is, I think the Commission, frankly, can tailor remedies. And it does tailor remedies. And this decision shows exactly how it does that. So the Commission, for example, can limit it to goods that are imported with the intent to induce. The Commission can also delay its orders for exclusion to allow the design around. And in this case, what the Commission did, is it actually decided to not post a bond, or not require a bond. And so during the entire 60-day presidential review period, Comcast could bring in these infringing boxes. And then once that period ended, Comcast was promptly able to redesign things to avoid infringement, get a certification from Customs and Border Protection, and begin bringing in the boxes on the certification that these would not be used for the infringing purpose. And I know that opposing counsels point to doubt that the change made here was to the system, not to the boxes themselves. But I don't think that has any effect here. It's based on faulty reasoning. For example, if Apple were importing infringing iPhones, I see I'm out of time. Can I have one more question? Finish the thought. So finish the thought. If they were importing infringing iPhones, for example, that had a weather app that communicated with a server, and that was the infringement, they could either change their iPhones to remove the app, or they could cut the communication with the server so the weather app isn't working anymore. And what Comcast effectively did here was the latter. It effectively cut that communication with the remote in order to, rather than changing the box themselves. And that's because it's a system claim. And the system claim required that communication. And I'm not going to describe it in detail, but I think if the court were to look at page 5831, which describes the tracing of the data and the information that goes on, starting with the client apps on the left, and it moves across to the right and up, and it has the dogleg eventually over to the DVR, you would see that that's the communication path that just got cut in order to avoid infringement. Thank you, Anna. If there's no question. Any questions for the application? Thank you. Thank you. I'd like to make a couple specific points about importation and then go back to articles and infringement. With respect to importation, just to be clear in response to the question you asked me, Your Honor, Comcast did not pay the importation duties. Right. We did not. And that's at page 3201. Yeah, I was aware of that. And we were not the consignee either. So on that score. Now, in terms of what my friend, Mr. Lampkin, says about these boxes being designed to infringe. Now, the other part, it is a case that you maintain ownership of the boxes. That's correct. That's the standard industry practice for all cable systems. So they do maintain ownership. The boxes don't enter freely the U.S. market. They remain in possession and control of Comcast. They do. But they are used, as the ALJ found and the commission upheld, overwhelmingly in non-infringing ways. And my friend quoted some numbers. But the numbers on the other side of it, for 22 million people who have these boxes, the boxes are never used in an infringing way. And even for the other people that my friends- But our panel all focuses on infringement, not the number or the frequency of the episodes of infringement, correct? But I do think it gets to the point of why there is a problem severing the commission's exercise of jurisdiction from the question of whether the articles infringe when they cross the border. Because it creates precisely the problem that you have here in this situation with the remedy, in that the remedy is widely disproportionate because the remedy requires exclusion of all the articles. Yeah, except that, because there was enough time or whatever, you were able to make the fix so that even now those 1% can't infringe because that function is not there anymore. And so nobody's infringing. And so nothing of yours is being excluded for non-infringing uses, which would be a problem if you couldn't adapt. I mean, if 100% of your boxes were excluded for only 1% usage and you had no way to address that, I think there would be a significant problem. But you had a very quick and easy fix, which is get rid of the offending functionality. And you did that and you got your boxes back in. I don't understand why that's not a reasonable exercise of the commission's discretion. Because the commission didn't exercise discretion in that way, Your Honor. The commission banned them. We made the change. Now, it's true that the ransom payment was rather low in this case, but that doesn't make it not extortion. And there are going to be other... What other way would they have remedied the... I know you disagree that there's infringement and inducement and all that, but let's just start from the premise that you're liable for all of this. What other way would they have remedied this? Your Honor, I'm not going to duck your question, but I do think that's our point. Our point is that the remedy, the fact that they have this problem with the remedy that they can't make it fit the violation shows you that it's not something that was in the contemplation of Congress in the first place. I get that, but to me, that sounds like you're arguing against Suprema, which we can't do anything about. Well, I've tried to explain why I don't think that's the case. And if I could just sum up briefly, if I might, that I do think it's important to remember that this is an in-rem statute. It focuses on cross-border activity and it's about unfair trade practices. And what we have in this case is a dispute between two domestic companies about conduct that's occurring in the United States. The inducing activities in the United States and the allegation that we're directly infringing as a result in the United States really doesn't have anything to do with unfair trade practices. And that's why I think it's important that the respect for the statutory text and its in-rem focus be enforced, because otherwise you're going to be in precisely this kind of a situation. And you're going to be in a situation in which... The in-rem focus of the 337 case is to be able to define the parameters of an unfair trade practice. It seems to me that if your position was adopted, then it would lead to widespread circumvention and it would actually make 337 superfluous. There would be no use for it. All you have to do is, for example, this is the infringing feature, this is not. Well, if it's sold in the United States, it's infringing, but hey, let's import them. And once they come into the U.S., then we just put them together and sell them and we'll take our chances with the district court. But 337 is designed to prevent that from happening, to prevent this from coming in into the U.S. Customs Territory. That's what 337 is designed to do. And it just seems to me, given my own trade experience, that this would lead to widespread circumvention of U.S. Customs laws. I appreciate that, Your Honor. And perhaps that would explain a situation like Suprema where 100% of the articles were going to be used for infringing purposes. But the problem with allowing the complete, but there was a link to the statutory text, in Your Honor's opinion, in Suprema. When you sever the link to the statutory text, you're in a situation where, respectfully, I think- But you do agree that 337 is a trade statute? Yes, Your Honor. Polices unfair trade practices. It addresses unfair trade acts. Yes, and the provision here applies to the unfairness in the importation of articles that infringe. And I think that's the fundamental problem with the case my friends on the other side are advancing. There are no articles that infringe when they cross the border, so there is no unfair trade practice when these articles cross the border. And I do think that's the fundamental point here. Thank you. No questions? Okay, thank you. Thank you all. The case is taken into submission.